# SEPTEMBER TERM.

## CHARLESTOWN.

TIERNAN'S ADM'R *v.* MINGHINI'S ADM'R *et al.*

Submitted September 3, 1886.—Decided September 18, 1886.

1. Where an appealable decree was entered in a cause in 1877, and subsequent thereto other decress were entered, to which an appeal is properly allowed by this Court, but not within five years from the date of said decree of 1877, HELD :

   This Court on such appeal has no authority to consider or review said decree of 1877 or any of the proceedings had in the cause anterior to the entering of said decree.    (p. 318.)

2. A case in which it is held that the doctrine of *laches* and staleness, relied on to exempt an administrator or his representatives from settling his administration accounts, has no application. (p. 322.)

3. A decree is entered in a cause ascertaining and fixing the aggregate amount of the plaintiff's debt and giving interest on such aggregate from the date of the decree, as prescribed by our statute, Code, ch. 131, sec. 16, HELD :

   It is error in a subsequent decree, *entered in the same cause* several years thereafter, to re-aggregate such debt by calculating interest on said first aggregate sum to the date of the latter decree, then adding this interest to the sum of the first decree and giving interest on the second aggregate from the date of the last decree.   (p. 323.)

*George Baylor* for appellant.

*D. C. Westenhaver* and *E. B. Faulkner* for appellee.

SNYDER, JUDGE :

In the year 1818 Luke Tiernan recovered against Joseppi Minghini, in the county court of Berkeley county, two judgments for $458.33 each, with interest and costs, upon which executions were duly issued.  In 1819 Minghini filed his bill in said court and enjoined the collection of said

judgments, and this injunction continued in force until 1846. Minghini died intestate in 1825 possessed of a considerable estate, both real and personal, and he left surviving him a widow, Mary Minghini, who subsequently married one Gregory, and he also left four children as his heirs-at-law, one of whom was Simoni L. Minghini. The widow qualified as administratrix of the decedent and settled her administration accounts for the years 1825, 1826 and 1827, showing a balance due from her to the estate of $788.20 at the close of the settlement in the latter year. In 1830, after her marriage, she made an addendum to her settlement charging herself with a slave named Charlotte at the appraisement price of $225.00, and made the balance due as of that date $1,032.03. This is all that is officially shown as to her administration. The injunction was dissolved and the bill dismissed in May, 1846. In the latter part of the same year the widow died intestate, and Simoni L. Minghini qualified as her administrator and also as administrator *de bonis non* of the estate of his father, Joseppi Minghini, deceased. In November, 1846, the county court appointed appraisers of the unadministered assets of said Joseppi's estate, and they appraised four slaves, Edmund, Toney, John and Maria, as such assets.

Luke Tiernan having died in the year 1847, Silas Harlan as his administrator filed his bill in the circuit court of Berkeley county in February, 1850, against the administrator and heirs of said Joseppi Minghini and others to enforce the aforesaid judgments against the estate of said Joseppi. In 1852 the said administrator, Simoni L. Minghini, answered the bill denying the justice of the said judgments or the right of the plaintiff to collect the same and relying upon the defence of the lapse of time, the staleness of said claims and the statute of limitations. On October 5, 1855, the cause was referred to a commissioner. In response to this decree Commissioner Garard, on Sept. 3, 1859, filed his report showing a settlement of the accounts of Simoni L. Minghini as administrator *ds bonis non* of Joseppi from January, 1847, to January 1, 1859, and reporting the balance due from the administrator to the estate to be as of the latter date $2,434.58. To this report the administrator excepted stating in general

terms that he was not justly chargeable with the said sum of $2,434.58 found against him. On October 4, 1859 the court entered a decree overruling said exception to the report and ordering the administrator to pay said sum to the plaintiff on his debt. From this decree the administrator obtained an appeal to the district court of appeals held at Winchester, and that court by a decree, pronounced December 20, 1860, reversed the said decree of October 4, 1859, upon the ground that the decree of October 5, 1855 on which Commissioner Garard's report was based "was erroneous in devolving upon the commissioner inquiries and functions beyond the province of a commissioner and legitimately appertaining to the judicial functions."

May 31, 1870, the cause was again referred to a commissioner to report the amount of the plaintiff's demand and other matters. On November 4, 1871, an order was entered suggesting the death of the defendant, Simoni L. Minghini, and by consent of the parties reviving the cause in the name of A. J. Thomas, administrator *de bonis non* of Joseppi Minghini, and said Thomas as administrator of said Simoni Minghini, deceased. The commissioner filed his report December 4, 1872, showing that the amount due on the plaintiff's judgments after allowing offsets was $1,908.88 as of March 1, 1873. By decree of May 19, 1874, the said report was confirmed, and the administrator of Joseppi Minghini ordered to pay to the plaintiff the said sum of $1,908.88 with interest thereon from March 1, 1873, and the costs of this suit. An amended bill was filed by the plaintiff making A. J. Thomas administrator *de bonis non* of Joseppi and John H. Sherman and Joseph L. Minghini administrators of Simoni L. Minghini and the heirs of the latter formal parties; and then by decree of December 11, 1877, wherein it is stated that Simoni Minghini is shown to be indebted to the estate of his father Joseph in the sum of $2,434.58 as of January 1, 1859, and John H. Sherman and Joseph L. Minghini as administrators of said Simoni are ordered to pay to the plaintiff the said sum of $1,908.88 with interest, to be levied of the assets of their decedent in their hands, as well as the costs of this suit.

By an order entered November 2, 1881, the cause was re-

ferred to Commissioner Colston to settle the accounts of Simoni Minghini as administrator *de bonis non* of Joseppi Minghini, to report the real and personal assets of the estate of said Joseppi and to audit all the debts due from said estate, &c.

The commissioner filed his report April 11, 1882, in which he reported that the estate of Joseppi, which came into the hands of Simoni as administrator *de bonis non*, consisted of $884.22, the proceeds of two slaves sold in 1846, and the hires of four slaves, Edmond, John, Tony and Maria, from January 1, 1847 to January 1, 1862, and that the amount due to the estate from the administrator was as of December 31, 1861, $3,818.09 of principal and $1,486.97 of interest which with interest on the principal to April 11, 1882, aggrigated as of that date $9,970.12, which by a correction subsequently made was reduced to $9,444.98 as of April 11, 1882. The commissioner also reported the amount due on the plaintiff's judgments to be $1,908.88 as of March 1, 1873. To this report the administrators of Simoni Minghini filed a number of exceptions nearly all of which relate to the sufficiency of the evidence to sustain the report. The court entered a decree July 31, 1885, overruling said exceptions and confirming said report. In this decree the interest on the amount of the plaintiff's debt of $1,908.88 (as fixed by the former decree of December 11, 1877,) from March 1, 1873 to October 11, 1881, is added to the principal which, together with $160.32, the taxed costs of this suit, aggregated as of October 11, 1881, $3,055.45. The decree orders this aggregate sum with interest thereon from October 11, 1881, to be paid to the plaintiff as a fiduciary debt out of the estate of Simoni Minghini, deceased, and refers the cause to a commissioner to ascertain and report the real and personal estate which descended from said Simoni to his children and what portion thereof is still in their possession. From this decree and the decrees of December 18, 1880, May 11, 1881, and November 2, 1881, the administrator of Simoni Minghini obtained this appeal.

The transcript of the voluminous record before us is not only fragmentary and imperfect, but it is gotten up so carelessly and in such confusion that it is almost impossible to determine what it really contains or the relation which the different portions bear to each other or upon the matters in

controversy. It is believed, however, that the preceding statement embraces so much of the history of the litigation as is material to present the questions involved in this appeal.

The appellant insists that the bill should have been dismissd; *first*, because of the staleness of the plaintiff's demand, laches and the bar of the statute of limitations; *second*, because he has failed to sustain his debt by legal and sufficient proofs; *third*, because he has not shown by evidence that any assets of the debtor, Joseppi Minghini, ever came to the hands of the appellant's intestate, Simoni Minghini, and *fourth*, from the great delay and neglect of the plaintiff to assert his claim it has become, on account of the death of the parties interested and the loss of papers and evidence, impossible at this late day to settle or adjust the accounts prayed for by the bill with any safety or certainty, the best result that can now be attained must of necessity be merely conjectural and that, therefore a court of equity will not entertain the bill or attempt such account.

So far as the first two of these grounds are concerned, it is only necessary to refer to the decrees of May 19, 1874, and December 11, 1877, entered in this cause. These decrees established the right of the plaintiff to prosecute this suit, the validity and amount of his claim and his right to recover the same not only against the estate of Joseppi Minghini but to have the same paid out of the estate of Simoni L. Minghini to the extent that assets came to his hands as administrator *de bonis non* of said Joseppi. Both of these were appealable decrees, and not having been appealed from within the five years prescribed by the statute they are irreversable and conclusive, not only as to the matters adjudicated by them but as to all matters preceding the date of the entry of the latter. According to the repeated decisions of this Court we have no authority to review any questions preceding said decrees in this cause or which were adjudicated and determined by them. *Lloyd* v. *Kyle*, 26 W. Va. 534; *Hoy* v. *Hughes*, 27 W. Va. 778; *Buster* v. *Holland*, 27 W. Va. 510.

The appellant being thus precluded from questioning these two decrees or any of the proceedings had in the cause preceding them or either of them, the only matters remaining

for consideration and review by this Court are the sufficiency of the evidence to sustain the report of commissioner Colton as to the liability of the appellant's intestate for the assets of the estate of Joseppi Minghini with which the commissioner has charged him as administrator *de bonis non* of said estate, and whether or not the laches of the plaintiff and the facts and circumstances disclosed by the record are such as to show that, according to the principles of equity, the plaintiff was not entitled to call for a settlement of the accounts of the appellant's intestate as such administrator.

It will be observed that the only charges made against the estate of Simoni Minghini, the appellant's intestate, consist of the proceeds of two slaves sold and the hire of four other slaves, which were in his possession. Of these six slaves it is fully proved and apparently conceded by all the parties, that at least four of them, viz : Jim, Isaac, John and Toney, were the children of Charlotte. As the ownership of the children of a slave, according to the law then in force, always followed the ownership of the mother, it follows that when we ascertain the ownership of Charlotte at the dates these children were born, we determine their ownership. The proof is clear that Charlotte was the slave of Joseppi long prior to and at the time of his death. She is so designated as such in the appraisement of his estate made in April, 1825. She is not included in the appraisement made in November, 1846, after the death of the widow, though two of the children, John and Toney, are. There is no evidence that she was alive at this latter date, and as no reference is made to her as being alive at that time, I think it may be fairly presumed that she was then dead. The widow settled her administration accounts on the estate of her husband for the years 1825 to 1827 inclusive, and thereby showed an indebtedness by her to the estate of $788.20 at the latter date. In November, 1830, she made an addendum to this settlement in which she charged herself with Charlotte as kept by her at the appraised price of $225.00, and omitted in her former settlement. The result of this addendum fixed her indebtedness to the estate at $1,032.03. This is the last account we have anywhere in the record of Charlotte, or of the said $1,032.03. It requires no argument to prove that the

widow and administratrix could not, under the the law of Virginia at that time, by such an entry or charge divest the title of the estate of her husband and herself become the owner of Charlotte.   There was no statute authorizing any such transaction, and by the general law she could not at the same time be the seller and buyer of Charlotte.   *Newcomb* v. *Brooks*, 16 W. Va. 32.   Consequently, as there is no evidence even tending to prove that Charlotte ceased to be the property of the estate of Joseppi, the legal presumption is that she continued to be such up to the date of her death, and that all her children were likewise the property of said estate.   This conclusion is fully sustained by the testimony in the cause. It is shown by the evidence that the widow, Mrs. Gregory, a short time prior to her death in 1846, directed one Van Dorn to sell the slaves, Jim and Isaac, which he did at the price of about $1,200.00, of which sum the $884.27, charged by the commissioner to Simoni Minghini, was subsequently paid to and received by him as administrator of his father's estate.   This charge was made against Simoni long before his death and the evidence tends to prove rather that he admitted its justice than that he disputed it in any manner.

The slaves Edmund, John, Toney and Maria all appear on the appraisement made in November, 1846, of the unadministered estate of Joseppi which came to the hands of Simoni as administrator *de bonis non*.   This appraisement was signed by the appraisers and duly recorded, and by statute it is made *prima facie* evidence that the property embraced therein came to the hands of the administrator.   Acts 1824-5, ch. 8, sec. 6, p. 11; Code of Va. (1860) ch. 130, sec. 12, p. 596. In addition to this the two surviving appraisers, who made and signed said appraisement, in their depositions taken and filed in this cause, testify positively that these four slaves were shown to them by Simoni Minghini, who represented that they were the property of his father's estate and requested them to appraise them as such.   There is also abundant evidence to establish that Simoni as administrator *de bonis non* of his father took possession of all these slaves and retained the possession of them from the year 1846 until they were emancipated during the late war, and that for the greater portion of that time he hired them out from year to

year.   It is also shown by the parol evidence that these slaves were held by the widow during her life as her dower in the slaves of which her husband died possessed, and that she never asserted any other claim to them.   In fact it does not appear that any serious effort was ever made to question the conclusiveness of this evidence as to the title of these slaves except as to Edmund.   In 1822 he and other slaves then owned by Joseppi Minghini were conveyed by him in trust to Philip C. Pendleton and John R. Cooke trustees to indemnify David Hunter as surety for said Minghini.   Upon a statement attached to a receipt given by said Pendleton to Mrs. Gregory in March, 1832, which purports to give the items paid on account the liability against which said Hunter was intended to be indemnified by the aforesaid trust deed, this item appears as one of the credits thereon: "Sale of Edmund $340.00, commission off $3.23."   It is contended by the appellant that this fugitive paper, without any evidence of its genuineness or how it came into the record, is sufficient to prove that Edmund did not belong to the estate of Joseppi Minghini from 1847 to 1862.   Even if the genuineness of this paper had been fully proven, it being a mere private paper, *res inter alios acta,* would not be evidence in this cause to prove the sale of Edmund.   But as before shown Edmund was not only appraised in 1846 as the property of the estate of Joseppi and taken possession of as such by Simoni as administrator *de bonis non,* but said administrator kept him from that time and hired him out from year to year until the year 1863.   There is other evidence and many circumstances all tending to prove that all four of these slaves did in fact belong to the estate of Joseppi Minghini and were so held and treated by Simoni from the time he took them into his possession as administrator in 1846.   But it is unnecessary to prolong this discussion by referring to this evidence or these circumstances, because if the report of the commissioner rested alone upon the evidence specially considered, this Court would not set aside the report.   The rule is fully established, that where questions of fact are referred to a commissioner his findings will not be set aside or reversed, unless it plainly appears that they are not warranted by any reasonable view of the testimony.   And this rule

operates with increased force upon an appellate court when the report has been approved by the decree of the circuit court. *Handy* v. *Scott,* 26 W. Va. 710; *Boyd* v. *Gunnison,* 14, W. Va. 1.

The character of the property with which the administrator has been charged by the commissioner and the nature of the evidence by which the charges are sustained leave but little to be said as to the appellant's defence based on the charge of laches and staleness. Simoni Minghini, the administrator was alive when this suit was instituted in 1850 and he lived twenty years thereafter. The suit was brought within less than four years after he qualified as administrator. There was certainly no delay or laches in calling upon him for a settlement of his accounts. Even if no suit had been brought the law made it his imperative duty to settle his accounts annually. It does not therefore lie in his mouth to charge the plaintiff with leaches or neglect. He was called upon not only by his duty under the law, but by this suit of the plaintiff to settle his accounts. The fact that the suit has not long since been determined, if the fault of either party, must be regarded as much his fault as that of the plaintiff. If he considered the plaintiff remiss in the prosecution of the suit, the law furnished him ample protection. But instead of availing himself of any such protection, he not only acquiesced in the delay, but by his refusal to render his accounts and resistance he in fact aided in producing the delay of which he now complains. Upon the most favorable view of the facts and circumstances in behalf of the appellant, it does not seem to me that the rules and principles of equity in regard to the doctrine of laches and staleness have any application whatever to this case so far as the matters now before us are concerned.

There is an error, however, in the aforesaid decree of July 31, 1885, for which that decree must be in part reversed. From the statement hereinbefore made it is shown that the court, after having aggregated and converted the principal and interest then due upon the plaintiff's judgment into an interest bearing fund by the decree of December 11, 1877, proceeded to make a second aggregation by the decree of July 31, 1885, including in the second aggregation not only

the interest on the first aggregate amount but also $160.32 as the taxed costs of this suit. Our statute provides that, "when a decree or judgment is rendered or made for the payment of money, it shall be for the aggregate of principal and interest *due at the time of the judgment or decree*, with interest thereon from that date." Code, ch. 131 § 16. Before the enactment of this statute, the rule of the common law was that the decree should be rendered for the principal of the debt with interest on that only. Neither the accrued interest nor the costs could be made an interest bearing fund, for the reason that that would have been compounding interest which was not lawful. Our statute has so far modified the common law as to require the court to include in the decree the interest accrued on the debt at the date of the decree, so as to make it as well as the principal of the debt bear interest from that date. But when such aggregation has been once made and a decree entered for the same with interest thereon from that date, it does not authorize a second aggregation of the same debt *in the same cause* in subsequent decrees providing for the payment of the said first decree, much less would it permit the aggregation of the costs of the suit then accrued to be made in such second decree. The costs do not bear interest either by virtue of the statute or the common law. However, when a suit is brought to enforce a judgment or decree rendered in another and distinct suit, it seems that in such suit there may be an aggregation of the principal, interest and costs recovered in the first action or suit, because these constitute the debt sought to be enforced in the second suit thus brought. *Douglass v. McCoy*, 24 W. Va. 722, 727; *Fleming v. Holt*, 12 W. Va. 144; *Bank v. Good*, 21 W. Va. 445.

The decree here in question re-aggregates the plaintiff's debt not as of July 31, 1885, its date, but as of October 11, 1881. There is no authority upon any construction of our statute to warrant the aggregation at that date. The interest and costs thus improperly embraced in the decree and made an interest bearing fund was $1,146.57. The interest on this sum from the latter date to July 31, 1885, the date of the decree, would be about $260.00. This sum the appellant would have been erroneously compelled to pay if he had elected to pay off

the decree at its date. The only manner in which he could relieve himself of this erroneous excess was by appeal; and this excess being a sum over $100.00 the appellant is entitled to recover his costs in this Court. *Bank* v. *Good, supra.*

For the reasons aforesaid, I am of opinion that so much of the decree of July 31, 1885 as fixes the debt of the plaintiff at $3,055.45 with interest thereon from October 11, 1881, should be reversed with costs to the appellants against the appellee, the administrator of Luke Tiernan, deceased, and in lieu of that portion of the decree so reversed the plaintiff's debt should be fixed at $1,908.88 with interest thereon from March 1, 1873 and the costs of this suit. The residue of said decree and the other decrees appealed from are affirmed.

REVERSED IN PART.   AFFIRMED IN PART.